# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

CRAIG JEFFREY ZALIGSON,

      Debtor.

Chapter 7
BKY NO. 16-41815-KHS

_____

JAMES L. SNYDER, UNITED STATES
TRUSTEE,

      Plaintiff,

    vs.

ADV NO. 17-4113-KHS

CRAIG JEFFREY ZALIGSON,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

At Minneapolis, Minnesota, November 2, 2018.

This adversary proceeding came on for trial beginning on May 29, 2018, and ending on May 30, 2018, to determine whether Defendant Craig Jeffrey Zaligson's discharge should be revoked pursuant to 11 U.S.C. § 727(d)(1). Colin Kreuziger appeared on behalf of Plaintiff and William Skolnik appeared on behalf of Defendant. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) & 1334, Fed. R. Bankr. P. 7001, and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(J) & (O).

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *11/02/2018*
Lori Vosejpka, Clerk, by LH

In this adversary proceeding, the issue is whether the discharge should be revoked for Defendant's making false oaths by failing to disclose two luxury watches in his petition and at his Section 341 meeting of creditors.   For the reasons stated below, the discharge is not revoked.

The U.S. Trustee, Plaintiff James Snyder, brought this action after learning about two Ulysse Nardin luxury watches, worth approximately $30,000, from a creditor who had seen two YouTube videos in which Defendant referred to one of the watches as "his."  Defendant told a suspicious story about the sale of the watches to a mysterious owner and the owner's failure to collect the watches--that Andrew Billison bought the watches in 2007 and 2009 from Defendant's company, dropped off the watches for repair in 2013, and never picked them up. Mr. Billison allegedly lived on an oil rig in Russia and had only returned to the United States twice since 2013.

There was a question about whether Mr. Billison really existed as the addresses on the sales receipts were not valid addresses, he was unable to produce picture identification, and his phone number appeared to be registered to a different person.  Now, there is no doubt that he is a real person and that he was the person who appeared at the deposition.

The story that Mr. Billison lived on an oil rig in Russia and did not return to retrieve two luxury watches after four years is not believable.  However, after listening to the testimony of the witnesses and reviewing the evidence, the Court is persuaded that it was not the Defendant who made up the story—it was Mr. Billison.  He was avoiding arrest.  Whether Defendant believed Mr. Billison's Russia story (which the Court doubts) is immaterial as independent witnesses and documentation show that a sale of the watches had taken place.

For purposes of revocation of the discharge, therefore, the Court determines that the U.S. Trustee has failed to meet his burden of proving that Defendant owned the watches and thus, should have disclosed them.

For the reasons stated below, the Court finds in favor of Defendant.

### THE PARTIES

The Plaintiff, James L. Snyder, is the United States Trustee for Region 12.  Plaintiff has standing to commence this adversary proceeding pursuant to 28 U.S.C. § 586(a) and 11 U.S.C. § 787(c)(1).

The Defendant, Craig Jeffrey Zaligson, is a resident of the State of Minnesota and the debtor in this bankruptcy case.

### WITNESSES

The following witnesses provided testimony at the trial:

- Craig Jeffrey Zaligson – Mr. Zaligson is the Defendant and the debtor in the Chapter 7 bankruptcy case.  He testified about the sale of the two Ulysse Nardin watches to Mr. Billison and the story Mr. Billison had told him about his work and travel to Russia.  There were inconsistencies in Mr. Zaligson's testimony regarding the sale to Mr. Billison.  However, Mr. Zaligson's testimony that he did not disclose the two watches in his Chapter 7 petition, schedules, or statement of financial affairs based on the advice of his Chapter 7 bankruptcy attorney was consistent and credible.

- Stephanie Klemz – Ms. Klemz, a child support officer for Hennepin County, testified about the child support obligations owing by Mr. Billison, his criminal history, and outstanding arrest warrants.  She was credible.

3

- Bruce Crawford – Mr. Crawford, a Minnesota licensed attorney, represented Mr. Billison when he was deposed by Plaintiff.  Mr. Crawford was a credible witness.

- Zanetta Diaz – Ms. Diaz is employed by Defendant's company.  She credibly testified that she had called Mr. Billison on several occasions about retrieving the watches, although she did not reach him.  She also testified about her handwritten notes on the back of the repair receipts made when attempting to contact Mr. Billison.

- Michael Strom – Mr. Strom is an attorney and customer of Defendant's businesses.  He testified that he was familiar with one of the watches at issue in this case.  Prior to the bankruptcy, he inquired about the price of one of the watches at issue.  Mr. Strom testified that Defendant told him the watch was not for sale as the owner was out of the country and had not picked it up.  He was a credible witness.

- Karen Billison – Ms. Billison is Andrew Billison's mother and she was a credible witness.  Ms. Billison testified that her son has lived in Minneapolis since he graduated from high school and that she last saw him on May 28, 2018, the night before trial.  She also testified that she did not know where he was currently employed.

- Gail Pesis – Ms. Pesis has been Defendant's significant other for thirty-two years.  Ms. Pesis testified that she was present when Mr. Billison purchased one of the watches at issue in this case.  Ms. Pesis is not disinterested as she

has been supporting Defendant since he lost his home in foreclosure and has

an incentive to keep Defendant debt-free.

- Matthew D. Swanson – Mr. Swanson is a Minnesota attorney representing

  Randall Seaver, the Chapter 7 Trustee in Defendant's bankruptcy case.  He

  was a credible witness.

- Andrew Billison – He did not appear at trial.  His deposition was received into

  evidence.  He was not credible as his statements were directly contradicted by

  his mother, who was credible.

## FACTS

The following facts were either stipulated to by the parties or found by the Court after

trial.

### Case and Background Information

1. Defendant is a resident of the State of Minnesota.

2. Defendant filed a voluntary petition for relief pursuant to Chapter 7 of Title 11 of

the United States Code on June 16, 2016.[1]

3. Randall Seaver was appointed Chapter 7 Trustee of the Defendant's bankruptcy

estate.

4. Defendant filed his original schedules on June 16, 2016 ("Original Schedules").[2]

5. Defendant's Original Schedules included a single Seiko men's watch and a pair of

cuff links valued at $600.00, but did not list any Ulysse Nardin watches.[3]

6. Defendant's Statement of Financial Affairs did not state that he was holding or

controlling any property that was owned by someone else.[4]

---

[1] Ex. 3.
[2] *Id.*
[3] *Id.* at 12.

7.      Pre-petition, Defendant owned and operated Midwest Diamond & Watch, Inc.

("Midwest Diamond"), which did business under the assumed name TimeScape beginning in

2012.[5]  Defendant was the sole owner of Midwest Diamond.[6]  Defendant listed his 100%

ownership interest in Midwest Diamond in the Original Schedules and Amended Schedules.[7]

8.      Midwest Diamond ceased doing business on the Petition Date.[8]

9.      On June 17, 2016, one day after filing, Defendant organized a new entity called

TimeScape USA, LLC ("TimeScape") and began doing business as that entity.[9]  There were no

documents showing a transfer or sale of Midwest Diamond's assets or inventory to TimeScape.

10.     Prior to the meeting of creditors, Defendant sent Mr. Seaver a list of inventory

and consigned items held by Midwest Diamond.[10]  There were no Ulysse Nardin watches on

either list.[11]

11.     Mr. Seaver convened the meeting of creditors on August 8, 2016.[12]

12.     Defendant testified at the meeting of creditors that Midwest Diamond had

previously carried high-end watches, including Ulysse Nardin watches, but that it ceased selling

them before the 2008 recession.[13]

13.     Defendant also testified that the information in the documents filed with the Court

were true and correct, contained no errors or omissions, and that all of his assets were listed in

the schedules.[14]

---

[4] *Id*. at 41.
[5] Trial Tr. vol. 1, 9:21–10:8, 11:4–9.
[6] *Id*. at 10:9–11.
[7] Ex. 3 at 13, Ex. 5 at 4.
[8] Trial Tr. vol. 1, 12:16–21.
[9] *Id.* at 13:14–20.
[10] *Id*. at 41:9–42:24.
[11] Trial Tr. vol. 2, 295:24–296:16.  Defendant and Mr. Swanson provided conflicting testimony as to whether the Ulysse Nardin watches were listed on the inventory and consignment list provided to Mr. Seaver. *Compare* Trial Tr. vol. 1, 42:25–43:25, *with* Trial Tr. vol. 2, 295:24–296:12.  Mr. Swanson's testimony was credible and the Court finds that the watches were not included on any lists provided to Mr. Swanson or Mr. Seaver.
[12] Trial Tr. vol. 1, 40:1–8, 40:21–41:2; Ex. 4.
[13] Trial Tr. vol. 1, 10:20–22; Ex. 4 at 4:25–7:1.

14.    Defendant did not tell Mr. Seaver that he was in possession of two Ulysse Nardin watches at the meeting of creditors.[15]

15.    Defendant filed amended schedules on September 8, 2016 ("Amended Schedules") that did not include any Ulysse Nardin watches.[16]

16.    The Court entered its Order granting Defendant's discharge on September 19, 2016.[17]

### Chapter 7 Trustee Learns About Watches and Sale

17.    On March 31, 2017, Mr. Swanson first learned about the watches when he received an email from a creditor's attorney stating that Defendant had posted two videos on YouTube in which he is seen wearing one of the two Ulysse Nardin watches at issue.[18]

18.    Defendant posted the first video on May 12, 2016, approximately one month before the Petition Date.[19]  In that video, Defendant refers to the Ulysse Nardin watch as "my watch" on two separate occasions.[20]  The video also features a second watch, but Defendant does not refer to that watch as "his" at any point.[21]

19.    Defendant posted a second YouTube video on March 6, 2017, approximately 10 months after the Petition Date.[22]  Defendant is seen wearing the same watch that he referred to as "my watch" in the May 12, 2016 video.[23]  Defendant, however, had changed the watch band from the first video.[24]

---

[14] Trial Tr. vol. 1, 43:16–44:10.
[15] *See generally* Ex. 4.
[16] Ex. 5 at 3.
[17] Trial Tr. vol. 1, 51:5–8.
[18] Trial Tr. vol. 2, 275:20–276:16; Ex. A.
[19] Trial Tr. vol. 1, 23:6–14; Ex. 1.
[20] Trial Tr. vol. 1, 18:21–19:4, 19:17–22; Ex. 1.
[21] Trial Tr. vol. 1, 19:23–20:14; Ex. 1.
[22] Trial Tr. vol. 1, 23:6–14, Ex. 2.
[23] Trial Tr. vol. 1, 23:18–21.
[24] *Id*. at 23:22–24:13, 26:9–17.

20.     On June 7, 2017, Mr. Swanson conducted a Rule 2004 examination of

Defendant.[25]  During the course of the examination, Mr. Swanson showed Defendant the first

YouTube video.[26]  After Defendant viewed the video, but before Mr. Swanson could question

Defendant about the statements he made in it, the court recorder's computer crashed and the

parties were required to take a 10 to 15 minute break.[27]  During that break, Defendant met in

private and conferred with his attorney.[28]

21.     After resuming the 2004 examination, Defendant testified that he was holding two

Ulysse Nardin watches for Mr. Billison.[29]  Defendant also testified that Mr. Billison had

purchased the watches from Midwest Diamond in 2009 or 2010 and that he had dropped them

off for repairs in April, 2013.[30]  Defendant testified that Mr. Billison told him that he would be

back "the next day" to pick them up.[31]

22.     Defendant does not frequently wear watches owned by customers and usually

only does so when attempting to sell watches on consignment for clients.[32]  Defendant testified at

the 2004 examination that there were times he wore one of Mr. Billison's watches.[33]

23.     Defendant testified at trial that calling the watch "his" was a poor choice of words

and that any use of the watches in the videos was for marketing and demonstration purposes

only.[34]

24.     After the Rule 2004 examination, Defendant provided Mr. Swanson with two re-

printed receipts purporting to be evidence of Mr. Billison's purchases.[35]  The receipts indicate

---

[25] *See generally* Ex. 6.
[26] Trial Tr. vol. 2, 277:19–21.
[27] *Id.* at 277:19–278:2.
[28] *Id.* at 278:10–17.
[29] Trial Tr. vol. 1, 36:20–37:2; Ex. 6 at 44:15–25.
[30] Ex. 6 at 45:16–25.
[31] Trial Tr. vol. 1, 60:13–16; Ex. 6 at 45:16–22.
[32] Trial Tr. vol. 1, 61:2–17.
[33] Trial Tr. vol. 1, 60:23–61:1; Ex. 6 at 47:19–48:1.
[34] Trial Tr. vol. 1, 19:17–22, 102:5–12; Ex. 6 at 37:18–23.

that one watch was purchased on November 23, 2007, and the other watch was purchased on

June 5, 2009.[36] The addresses listed on the receipts do not contain valid mailing addresses.[37]

Defendant testified that the addresses on the receipts were given to him by Mr. Billison.[38]

25.     The receipts provided to Mr. Swanson following the Rule 2004 examination bore

the name Timescape USA, LLC, which was an entity that did not exist until 2016.[39] Defendant

did not begin doing business under the assumed name TimeScape until 2012.[40]

26.     The original receipts were produced to Mr. Kreuziger on December 7, 2017 and

bore the name Midwest Diamond.[41] At trial, Defendant testified that the computer operating

system and software system used by his business had changed since Mr. Billison purchased the

watches.[42] The receipt copies provided to Mr. Swanson had been reprinted on new forms using

the correct sale information.[43] The Court finds Defendant's explanation credible.

27.      At trial, Defendant introduced the sales and use tax documentation for both

sales.[44] The documentary evidence shows Defendant's remittance of the sales and use tax for the

transactions to the State of Minnesota.  This was not challenged or refuted by Plaintiff.

**Contact with Andrew Billison**

28.     In order to contact Mr. Billison, Mr. Swanson sent a letter to the address for

Karen Billison, Mr. Billison's mother, around July 11, 2017.[45] Ms. Billison testified at trial that

she had hand-delivered Mr. Swanson's letter to Mr. Billison in downtown Minneapolis.[46]

---

[35] Trial Tr. vol. 1, 67:24–68:21, 69:20–70:1, 102:17–25; Trial Tr. vol. 2, 283:18–284:12; Ex. 7.
[36] Trial Tr. vol. 1, 68:9–15; Ex. 7.
[37] Trial Tr. vol. 1, 70:8–25; Trial Tr. vol. 2, 285:17–286:21; Ex. 7.
[38] Trial Tr. vol. 1, 70:8–25.
[39] *Id.* at 13:14–20, 69:16–70:7; Ex. 1.
[40] Trial Tr. vol. 1, 9:21–10:8, 11:4–9.
[41] *Id.* at 75:15–76:12, 85:10–22, 103:17–20; Exs. 9, 11.
[42] Trial Tr. vol. 1, 80:2–81:3, 84:13–85:3, 103:1–20.
[43] *Id.* at 67:24–68:21, 69:20–70:1, 102:17–25.
[44] *Id.* at 106:7–107:14, 108:11–25; Exs. H, I, K–L.
[45] Trial Tr. vol. 2, 289:10–290:20; Ex. Q.

29.     Defendant received a call from Mr. Billison on July 18, 2017, stating that he had returned from Russia and wanted his watches back.[47]  Defendant told Mr. Billison to contact Mr. Seaver.[48]  Mr. Billison then called and spoke to Mr. Swanson and told him that he would be returning to the United States in August of 2017 after a four-year absence.[49]  Mr. Billison stated that he had left his watches with Defendant and wanted them back.[50]  Mr. Huffman sent Mr. Swanson an email indicating the same information.[51]

30.     Mr. Billison contacted Mr. Swanson from a telephone number identified on Mr. Swanson's screen as belonging to Ryan Dietzler.[52]  The phone number had a 612 area code.[53] Mr. Swanson asked Mr. Billison to bring photographic identification and evidence of ownership of the watches to his office, which has not happened.[54]

31.     On September 11, 2017, Mr. Swanson sent a text message requesting Mr. Billison's mailing address to the telephone number from which he received the call from Mr. Billison.[55]  Mr. Billison responded to the text on October 20, 2017, stating that he was not in the country in September but that he was in "NYC," and wanted "his watches back."[56]

32.     On November 27, 2017, Mr. Billison executed an affidavit stating he purchased the two Ulysse Nardin watches from Midwest Diamond (the "Affidavit").[57]  As provided in the Affidavit, the first watch was purchased for $6,386.14 on November 17, 2007, and the second

---

[46] Trial Tr. vol. 1, 245:13–246:1.
[47] *Id*. at 87:4–88:17, 89:25–90:23; Ex. BB.
[48] Trial Tr. vol. 1, 90:15–17; Ex. BB.
[49] Trial Tr. vol. 2, 291:13–20, 311:8–21, 312:4–15; Ex. R.
[50] Trial Tr. vol. 2, 311:17–312:2; Ex. R.
[51] Trial Tr. vol. 2, 291:4–12.
[52] Trial Tr. vol. 2, 281:7–19.
[53] *Id*. at 281:7–19.
[54] *Id*. at 292:14–21, 293:5–21; Ex. R.
[55] Trial Tr. vol. 2, 315:19–316:21; Ex. T.
[56] Trial Tr. vol. 2, 317:1–6; Ex. T.
[57] Trial Tr. vol. 1, 177:4–9, 178:15–19, 182:7–23; Ex. 15 at ¶¶ 1–2.

watch was purchased for $12,657.00 on June 5, 2009.[58]  The Affidavit also states that Mr.

Billison brought the watches to Midwest Diamond for cleaning and repairs on April 24, 2013,

and that he never returned to pick them up.[59]

33.    The Affidavit contained very precise statements with respect to the circumstances

under which Mr. Billison purchased and relinquished possession of the watches.[60]  Such details

included exact dates of purchase, exact purchase prices, sales tax amounts, and model and serial

numbers for the watches.[61]

34.    On December 5, 2017, Mr. Crawford, Billison's attorney, sent a copy of the

Affidavit to counsel for Defendant.[62]  At that time, Mr. Crawford did not have a copy of the sales

receipts for the watches.[63]  On December 7, 2017, Defendant's counsel sent a copy of the

Affidavit to counsel for Plaintiff.[64]

35.    On December 8, 2017, Mr. Crawford produced copies of Mr. Billison's social

security card and birth certificate.[65]

36.    On December 14, 2017, Plaintiff's counsel issued a subpoena for the deposition of

Mr. Billison.[66]  On January 11, 2018, Mr. Billison appeared for his deposition.[67]

37.    Mr. Billison testified at his deposition that he was currently employed by Link Oil

Corporation and had been living on an oil rig in the Caspian Sea.[68]  Mr. Billison also testified

---

[58] Ex. 15 ¶¶ 1–2.
[59] *Id*. at ¶¶ 3–4.
[60] Trial Tr. vol. 1, 182:7–23; *see generally* Ex. 15.
[61] Trial Tr. vol. 1, 182:7–23, 185:21–186:11; *see generally* Ex. 15.
[62] Trial Tr. vol. 1, 175:18–177:3; Ex. 14.
[63] Trial Tr. vol. 1, 181:12–18.
[64] *Id*. at 175:18–177:3; Ex. 14.
[65] Trial Tr. vol. 1, 170:1–10; Trial Tr. vol. 2, 320:3–321:10.
[66] Trial Tr vol. 1, 201:13–18; Trial Tr. vol. 2, 294:9–16; Ex. 16.
[67] Trial Tr. vol. 1 170:20–171:4; *see generally* Ex. 18.
[68] Ex. 18 at 9:6–25.

that he had been doing that for a little over 10 years.[69]  Mr. Billison testified at his deposition that

he was not in Minnesota between 2007 and 2010.[70]  Mr. Billison further testified that he had only

traveled to Minnesota twice between 2010 and 2017—once for a friend's wedding in 2014 and

once in April of 2017 for his mother's birthday.[71]  He testified that he had been unable to return

to Midwest Diamond to retrieve the watches because he was living out of the country.[72]  There is

no evidence that he contacted Midwest Diamond or Defendant at any time after dropping off the

watches to arrange to pick them up until July 18, 2017, after the Rule 2004 examination.

38.     The deposition subpoena requiring Mr. Billison to appear and provide testimony

also required him to produce a government issued photographic identification.[73]  He did not

bring photographic identification to the deposition, but stated that he would bring his passport to

Mr. Swanson at his office.[74]

39.     Mr. Billison failed to provide the identification and Plaintiff filed a motion for

contempt.[75]  On April 27, 2018, this Court issued an order finding Mr. Billison in contempt for

his failure to appear and produce his identification.[76]  He did not purge himself of the contempt

and this Court issued a bench warrant for his arrest on May 16, 2018.[77]  Mr. Billison was not

found.

---

[69] *Id*. at 10:3–4.
[70] Ex. 18 at 12:14–13:5.
[71] *Id*. at 14:5–15:14.
[72] *Id*. at 24:3–22.
[73] Trial Tr. vol. 1, 201:23–202:1; Ex. 16.
[74] Trial Tr. vol. 1, 202:20–203:21.
[75] *Id*. at 203:19–204:1.
[76] Dkt. No. 35.
[77] Dkt. No. 40.

**Mr. Billison's Background**

40.    Ms. Klemz testified at trial that she is a child support officer for Hennepin County

and has been assigned Mr. Billison's file.[78]  Ms. Klemz is assisting the mother of Mr. Billison's

child in attempting to collect child support.[79]  She testified that there were several outstanding

arrest warrants for Mr. Billison related to paternity and child support.[80]  One warrant was issued

in 2006 and one in 2012.[81]

41.    Ms. Klemz testified that because of the past due child support obligations, a

passport hold had been in place on Mr. Billison's passport since April of 2007.[82]  Mr. Billison

would not have been able to obtain a new passport while the hold was in place and he could not

have gotten a new one until at least April of 2017.[83]

42.    Kanabec County has been unable to obtain any information regarding Mr.

Billison's employment since August of 2006.[84]

43.    Ms. Billison appeared and testified at trial.  She told the Court that her son had

always lived in the Minneapolis area since graduating from high school, but that she did not have

his current address.[85]  They did not have a close relationship.[86]

44.    Ms. Billison last saw her son on May 28, 2018, the night before trial.[87]  She and

Mr. Billison's father picked him up in downtown Minneapolis and drove him to a local Perkins

restaurant.[88]  They spoke in the car and she took a picture of him with her cell phone.[89]

---

[78] Trial Tr. vol. 1, 141:2–17, 148:21–149:6.
[79] *Id.*
[80] Trial Tr. vol. 1, 150:6–151:10, 156:16–21, 159:2–160:19; Exs. 28, 32–33.
[81] *Id.*
[82] Trial Tr. vol. 1, 156:22–157:24.
[83] *Id.* at 157:20–158:7.
[84] *Id.* at 156:13–18.
[85] *Id.* at 252:17–253:3, 253:19–254:1.
[86] *Id.* at 244:17–245:7.
[87] *Id.* at 243:4–6.
[88] *Id.* at 243:4–19, 247:21–248:1.

45.    She took a picture of Mr. Billison as requested by Defendant's attorney and she confirmed his identity at trial.[90]

46.    Ms. Billison testified that her son worked for an oil company, but she did not know the name of the company or what type of work her son did for the company.[91]  She testified that her son had previously been employed at Target and as a bouncer at a bar.[92]

47.    She was unaware of any child support obligations or arrest warrants.[93]

48.    Ms. Billison testified, as had her son at his deposition, that he had keratoconus, a disease that affects his vision and ability to drive.[94]  Ms. Billison testified that her son does not drive because of his eye condition and because his license was suspended in connection with a previous DUI conviction.[95]  Mr. Billison testified that he does not have a drivers license on account of his eye disease.[96]

49.    Ms. Diaz began working for Defendant at TimeScape in 2013.[97]  She made numerous attempts to contact Mr. Billison by phone in 2013 about the watches after they were dropped off for cleaning or repair.[98]  Ms. Diaz made contemporaneous notes on the back of the watch repair receipts regarding her attempts to reach Mr. Billison.[99]  One of the notes says "in Russia," which Ms. Diaz testified she wrote because she was told by Defendant that Mr. Billison

---

[89] *Id*. at 246:24–247:7.
[90] *Id*. at 246:24–247:15, 253:9–12.
[91] *Id*. at 240:15–22, 242:8–12.
[92] *Id*. at 242:20–25.
[93] *Id*. at 248:18–249:5.
[94] *Id*. at 246:12–16; Ex. 18 at 22:11–18.
[95] Trial Tr. vol. 1, 248:4–17.
[96] Ex. 18 at 22:11–18.
[97] Trial Tr. vol. 1, 212:11–12.
[98] *Id*. at 213:3–8, 213:16–19.
[99] *Id*. at 212:18–24, 213:9–19.

was in Russia.[100]  Eventually, the telephone number for Mr. Billison was disconnected.[101]  Ms.

Diaz never met or spoke with Mr. Billison.[102]

     50.    Mr. Strom testified that when he brought in a watch for repair in December of

2014, he asked Defendant the price of one of the watches at issue.[103]  Mr. Strom testified that

Defendant told him that it was a client's watch and not for sale.[104]  Mr. Strom testified that he

was told the client had not picked up the watch and was out of the country.[105]  Mr. Strom

testified that cleaning a watch similar to those at issue here would typically take a few weeks and

would cost approximately $950.00,[106] contrary to what was on the drop-off receipt that the cost

would be $0[107] and Defendant's testimony that Mr. Billison owed approximately $100 for the

repairs.[108]

     51.    Defendant has consistently maintained that he did not list the watches on the

Original Schedules, Statement of Financial Affairs, or Amended Schedules based on the advice

of his Chapter 7 bankruptcy attorney, Mr. Huffman, because the watches were owned by Mr.

Billison.[109]

     52.    On June 19, 2017, Plaintiff first became aware of the watches and of Defendant's

failure to list them in the Original Schedules, Statement of Financial Affairs, Amended

Schedules, or the inventory and consignment lists.[110]

---

[100] *Id.* at 213:9–19, 216:15–21.
[101] *Id.* at 218:9–15.
[102] *Id.* at 214:12–16, 215:2–5.
[103] *Id.* at 222:2–10, 225:1–226:2.
[104] *Id.*
[105] *Id.* at 225:23–226:2.
[106] *Id.* at 232:21–233:23.
[107] Ex. 13.
[108] Trial Tr. vol. 1, 58:19–22; Ex. 6 at 68:25–69.
[109] Trial Tr. vol. 1, 34:20–25, 35:10–37:9.
[110] Trial Tr. vol. 2, 287:6–289:5; Ex. B.

53.     Plaintiff filed this adversary proceeding on September 18, 2017, alleging that

Defendant knowingly and fraudulently made false oaths on his Original Schedules by failing to

disclose ownership of the two Ulysses Nardin watches, on his Statement of Financial Affairs by

failing to disclose that he was in possession of the two watches, and on his Amended Schedules

by failing to disclose his ownership of the two watches.[111]  Plaintiff also alleges that Defendant

knowingly and fraudulently made false oaths at the meeting of creditors by testifying that he

listed all his assets on his petition and schedules, by failing to disclose that he organized

TimeScape the day after he filed for Chapter 7 relief, and by testifying that Midwest Diamond

did not own any "high-end" watches at the time of the filing the Chapter 7 petition.[112]  Finally,

Plaintiff alleges that Defendant knowingly and fraudulently made false oaths at his Rule 2004

examination by testifying that the two watches were being stored for Mr. Billison.[113]  Plaintiff

seeks revocation of Defendant's discharge.

## DISCUSSION

Plaintiff asserts that Defendant made multiple false oaths during his bankruptcy case

relating to his alleged ownership or holding of the two Ulysse Nardin watches and seeks

revocation of discharge under 11 U.S.C. § 727(d)(1).  Defendant argues that he did not own the

watches and, therefore, the watches did not need to be disclosed.

If the two watches belonged to Defendant and were property of the bankruptcy estate,

Defendant was required to disclose the watches as jewelry on Schedule A/B.  If Defendant was

holding the watches in his individual capacity for Mr. Billison, Defendant would have been

required to disclose the watches on the Statement of Financial Affairs as property held or

controlled for another.  It is undisputed that the watches were not disclosed on Defendant's

---

[111] Compl. at ¶¶ 15–17.
[112] *Id*. at ¶ 18.
[113] *Id*. at ¶ 19.

16

Original Schedules, Amended Schedules, and were never mentioned at the meeting of creditors. It is also undisputed that Defendant did not list the watches as property being held for someone else on the Statement of Financial Affairs.

First, a debtor is generally not required to disclose property of a corporation, even if the debtor is the sole owner. *See McDermott v. Crabtree* (*In re Crabtree*), 554 B.R. 174, 192 (Bankr. D. Minn. 2016) ("As a general matter, property of the estate does not include assets owned by a corporation in which the debtor holds an interest."), *rev'd on other grounds*, 562 B.R. 749 (B.A.P. 8th Cir. 2017). Rather, a debtor is required to disclose any ownership interests in a business. Here, Defendant properly listed his 100% ownership interest in Midwest Diamond on both the Original Schedules and Amended Schedules.

Defendant argues that the watches were not included on the inventory and consignment lists provided to Mr. Swanson or Mr. Seaver because they were not owned by Midwest Diamond or on consignment. Neither party claims that the watches were being held on consignment. If the watches were being held by Defendant's company for the true owner, they did not need to be disclosed as inventory as Defendant was filing in his individual capacity. Plaintiff does not argue nor provide proof that the watches were owned by either Midwest Diamond or TimeScape at the petition date. Rather, Plaintiff argues that the watches were owned by Defendant individually.[114] This is the question the Court must determine. We turn to the burden of proof in a revocation of discharge action.

## A.     <u>Burden of Proof and Section 727(d)</u>

For individual debtors, the principal purpose of the Bankruptcy Code is to give a fresh start to the honest but unfortunate debtor, in part through a discharge of prepetition debt. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (citing *Grogan v.*

---

[114] "The only question is whether Mr. Zaligson is the owner of the watches." Pl.'s Post-Trial Br. at 20.

*Garner*, 498 U.S. 279, 286 (1991)); *see McDermott v. Petersen* (*In re Petersen*), 564 B.R.

636, 644 (Bankr. D. Minn. 2017).  Given the severe and extreme nature of a denial or

revocation of discharge, courts must "strictly and narrowly construe the provisions of

§ 727 in favor of a debtor."  *Petersen*, 564 B.R. at 644 (citing *Kaler v. Charles* (*In re

Charles*), 474 B.R. 680, 683 (B.A.P. 8th Cir. 2012)).  This is because "the denial of

discharge is a harsh result."  *Id.* at 645.  In order to bring a successful claim to deny or

revoke a discharge, a plaintiff must present reasons that are "real and substantial, not

merely technical and conjectural."  *Id.* (citing *Boroff v. Tully* (*In re Tully*), 818 F.2d 106,

110 (1st Cir. 1987)).

    The Bankruptcy Code provides:

> On request of … the United States Trustee, and after notice and a
> hearing, the court shall revoke a discharge granted under subsection
> (a) of this section if – (1) such discharge was obtained through the
> fraud of the debtor, and the requesting party did not know of such
> fraud until after the granting of the discharge.

11 U.S.C. § 727(d)(1).  The party seeking a revocation of discharge bears the burden of proving

each applicable element of 11 U.S.C. § 727(d) by a preponderance of the evidence.[115]  *In re*

*Petersen*, 564 B.R. at 644.

    The first element, discharge obtained through fraud of the debtor, is met if "grounds

existed which would have prevented the discharge had they been known and presented in time."

*Fokkena v. Peterson* (*In re Peterson*), 356 B.R. 468, 475 (Bankr. N.D. Iowa 2006) (quoting *First*

*Interstate Bank of Sioux City v. Ratka* (*In re Ratka*), 133 B.R. 480, 483 (Bankr. N.D. Iowa

1991)).  Thus, if the plaintiff can prove each of the elements that would be necessary to prevail

on a denial of discharge under 11 U.S.C. § 727(a)(2)–(5), the proof will be sufficient to

---

[115] Here, there is no dispute that Plaintiff did not know about the watches prior to the time of the discharge, thus
establishing the second element of § 727(d)(1); Plaintiff did not have knowledge of Defendant's alleged false oaths
until after the discharge was granted.  11 U.S.C. § 727(d)(1).

demonstrate that the discharge was obtained through the debtor's fraud. *See Carns v. McNally* (*In re McNally*), Adv. No. 15–01445, 2017 WL 4082093, at *4 n.32 (B.A.P. 10th Cir. Sept. 15, 2017) (collecting cases); *Davis v. Osborne* (*In re Osborne*), 476 B.R. 284, 292 (Bankr. D. Kan. 2012).

Under 11 U.S.C. § 727(a)(4)(A), bankruptcy courts may deny a discharge if "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account." 11 U.S.C. § 727(a)(4)(A). It is a question of fact as to whether a debtor made a false oath under Section 727(a)(4)(A). *In re Petersen*, 564 B.R. at 649.

"A denial of discharge under § 727(a)(4)(A) requires the objecting party to prove: (1) the debtor made a statement under oath; (2) that statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with a fraudulent intent; and (5) the statement related materially to the debtor's bankruptcy case." *Id*. at 648 (citing *Lincoln Sav. Bank v. Freese* (*In re Freese*), 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011)). Denial of discharge "is an extreme step and should not be taken lightly." *Id*. (quoting *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1992)).

**B.      <u>Statement Made Under Oath</u>**

As to the first element, statements made in a bankruptcy petition and schedules require the debtor to sign and verify under penalty of perjury and have the force and effect of an oath. *In re Peterson*, 564 B.R. at 648 (citing *Korte v. United States* (*In re Korte*), 262 B.R. 464, 474 (B.A.P. 8th Cir 2001)). In addition, "testimony elicited at the first meeting of creditors is given under oath." *Id*. Plaintiff is correct that Defendant's omission of the watches from his bankruptcy petition and schedules were statements made under oath.

19

It is undisputed that the watches were not disclosed on Defendant's Original Schedules, Amended Schedules, and were never mentioned at the meeting of creditors.  It is also undisputed that Defendant did not list the watches as property being held for someone else on the Statement of Financial Affairs.  Defendant signed and verified his bankruptcy petition and schedules under penalty of perjury and, as a result, Defendant's omission of the watches from his bankruptcy petition and schedules, as well as his testimony given at the meeting of creditors, were statements made under oath.

## C.   **False Statement**

The Bankruptcy Code imposes a duty on debtors that "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind."  *In re Charles*, 474 at 686–87 (quoting *In re Korte*, 262 B.R. at 474) (internal quotation omitted).  An omission in a debtor's bankruptcy petition and schedules is considered a false statement for purposes of Section 727(a)(4)(A).  *See, e.g.*, *In re Petersen*, 564 B.R. at 649.

Defendant omitted the two Ulysse Nardin watches from his Original Schedules, Amended Schedules, Statement of Financial Affairs, and failed to mention the watches at the meeting of creditors.  As discussed above, Defendant was not required to disclose property of Midwest Diamond, even though Defendant was its sole owner.  *See In re Crabtree*, 554 B.R. at 192.  Defendant did list his 100% ownership interest in Midwest Diamond on both the Original Schedules and Amended Schedules.  If the watches were Defendant's property, his omission of the watches would have constituted a false oath.  As discussed in greater detail below, however, Plaintiff failed to show that the watches were Defendant's property and, as a result, failed to show that Defendant's omissions were false.

20

Plaintiff argues that the story surrounding Mr. Billison is not believable and that Defendant is the true owner of the watches. The main evidence in favor of Plaintiff's position is the YouTube videos. Defendant clearly stated that one of the watches was "his" in the first YouTube video, posted pre-petition on May 12, 2016. He refers to the watch as "my watch" on two separate occasions. Defendant had no reason to claim the watch as his own in the video. Defendant also changed the watch bracelet on the watch post-petition, as was evidenced in the second YouTube video posted on March 6, 2017. There is no testimony or evidence as to who owned that bracelet and it was not disclosed on the schedules.

Plaintiff also argues that the receipts submitted by Defendant following the Rule 2004 examination were suspicious, as the receipts bore the name "Timescape USA, LLC." TimeScape is an entity that did not exist until June 17, 2016, long after the time of the purported sales. In addition, the receipt for the 2007 purchase lists an invalid mailing address for Mr. Billison and the 2009 receipt lists an address for Mr. Billison that does not exist.

Defendant explained that the inclusion of "Timescape USA LLC" on the receipts initially given to Mr. Swanson was due to the receipt copies having been re-printed on current invoice forms. Defendant testified, and the Court found credible, that the computer operating system and software system used by his business had changed from the time Mr. Billison purportedly purchased the watches to the time the receipts were re-printed and provided to Mr. Swanson. His testimony is corroborated by original receipts produced at trial that contained the correct name and address for Midwest Diamond.

Defendant also testified that the addresses on the receipts were given to him by Mr. Billison. There was no testimony or other evidence to refute this.[116]

---

[116] The Court has the distinct impression that Defendant doubted that the addresses were real at the time of the sale, but it did not matter—Defendant had made two sales.

Finally, Defendant testified that calling the watch his in the YouTube video was a poor choice of words and that any use of the watches in the videos were for marketing and demonstration purposes only.  Defendant does not frequently wear watches owned by customers and generally only does so when he is attempting to sell watches on consignment.  There were times he wore one of the watches at issue, even though it belonged to Mr. Billison.  The Court does not find the YouTube video persuasive evidence that Defendant owned the watches, especially with the evidence that will be discussed below.  The comments were not material to the marketing purposes of the video and appeared to be puffery.

The Court agrees with Plaintiff that the story about Mr. Billson's dropping off the valuable watches and the reason for not retrieving them—living on an oil rig in Russia—is not believable.  There are conflicting facts as to Mr. Billison's whereabouts during the entirety of the time in question.  But who created the story—Defendant or Mr. Billison?

Mr. Billison had a greater incentive than Defendant to create the Russia story and not return for his property.  Mr. Billison has been avoiding making payments on a large child support obligation and has been avoiding arrest.  Mr. Billison has refused to provide photographic identification, failed to comply with orders of this Court and other courts on a routine basis, and claims to live in the Caspian Sea working on an oil rig.  Further, Mr. Billison made no attempts to retrieve the watches until after Mr. Seaver and Plaintiff took the position that they belong to Defendant.  There is simply no reason why Mr. Billison failed to retrieve the watches before then, unless he wanted them to be kept hidden and he wanted to keep himself hidden.

The Court gives significant weight to the testimony provided by Ms. Billison that her son has resided in the Minneapolis area since graduating high school.  She testified that she hand-

delivered Mr. Swanson's July 11, 2017 letter to Mr. Billison in downtown Minneapolis.  She saw

him on May 28, 2018, the night before trial in order to take a picture.

As to the whether the watches were sold to Mr. Billison, there is significant corroborating

evidence that the sales occurred.  Defendant submitted unrefuted documentary evidence in the

form of confirmation statements from the Minnesota Department of Revenue that two watches

were sold by Midwest Diamond on the dates and prices stated on the original receipts.  Midwest

had charged, collected, and remitted the appropriate sales tax to the State of Minnesota.

There is additional support for Defendant's position that he did not own the watches from

Mr. Strom and Ms. Diaz's testimony.  Mr. Strom, an unbiased witness in this adversary

proceeding, testified that when he brought in a watch for repair in December of 2014, he asked

Defendant the price of one of the watches at issue.  Mr. Strom testified that Defendant told him

that it was a client's watch and was not for sale.  Defendant told Mr. Strom that the client had not

picked the watch up and was out of the country.  This conversation took place long before the

filing of the bankruptcy.

Ms. Diaz began working for Defendant at TimeScape in 2013.  She testified that she

made numerous attempts to contact Mr. Billison by phone over several months about the watches

in 2013.  Ms. Diaz contemporaneously made handwritten notes on the back of the watch repair

receipts. One of the notes says "in Russia," which Ms. Diaz testified she wrote because she was

told by Defendant that Mr. Billison was in Russia.  Eventually, the telephone number for Mr.

Billison that Ms. Diaz had been calling was disconnected.  This occurred several years before the

bankruptcy filing.

Thus, based on the evidence, the Court determines that the watches were sold to Mr.

Billison.  Plaintiff has failed to carry his burden to show by a preponderance of the evidence that

the watches were Defendant's property and, as a result, has failed to show Defendant made a false statement under oath.

**D.** **Knowledge**

As to the third element, a debtor "acts knowingly if he or she acts deliberately and consciously." *Id.* at 650 (citing *Roberts v. Erhard* (*In re Roberts*), 331 B.R. 876, 883–84 (B.A.P. 9th Cir. 2005)). Careless or reckless acts committed by the debtor do not satisfy the knowledge requirement of § 727(a)(4)(A). *Id.*

The question of whether or not Defendant knew the omission of the two watches from his bankruptcy petition and schedules was false turns on whether or not Defendant actually owned the watches. As stated above, the watches had been sold to Mr. Billison and thus, there were no false statements made knowingly by Defendant.

**E.** **Fraudulent Intent**

As to the fourth element, statements made "with reckless indifference to the truth are regarded as intentionally false." *In re Charles*, 474 B.R. at 684. This element requires more than an "honest mistake or oversight by the debtor." *In re Petersen*, 564 B.R. at 648 (citing *Giansante & Cobb, LLC v. Singh* (*In re Singh*), 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010)). A party can establish fraudulent intent by circumstantial evidence. *Id.* at 650. Courts, however, are "often understanding of a single omission or error resulting from innocent mistake." *Id.* at 650–51 (citing *Jordan v. Bren* (*In re Bren*), 303 B.R. 610, 613 (B.A.P. 8th Cir. 2004), *overruled on other grounds*, 331 B.R. 797 (B.A.P. 8th Cir. 2005)).

Plaintiff argues that the Court can infer that Defendant's alleged false oaths relating to ownership of the watches were made with fraudulent intent because Defendant made multiple false oaths to conceal the watches from the Chapter 7 Trustee and failed to disclose the existence

24

of the watches until pressed at the Rule 2004 examination.  Defendant maintains that because the

watches were sold by Midwest Diamond to Mr. Billison and were being held for Mr. Billison by

Midwest Diamond, he did not disclose the watches at issue in his Chapter 7 petition, Original

Schedules, Statement of Financial Affairs, and Amended Schedules based on the advice of his

Chapter 7 bankruptcy attorney, Mr. Huffman.  Defendant asserts that he did not recklessly

disregard the truth because the watches were not his property to disclose.  The Court agrees with

Defendant.

Plaintiff failed to prove that the watches were Defendant's property.  Thus, Plaintiff has

failed to establish that Defendant made false statements under oath with the requisite fraudulent

intent.

**F.    <u>Materiality</u>**

As to the final element, "[t]he subject matter of a false oath is 'material' and thus

sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or

estate, or concerns the discovery of assets, business dealings, or the existence and disposition of

his property."  *Id*. at 651–52 (citing *In re Charles*, 474 B.R. at 868).  The threshold for

materiality in the Eighth Circuit is fairly low.  *In re Charles*, 474 B.R. at 686.

Here, the alleged false oaths would materially relate to Defendant's bankruptcy case

because they related to property of the estate worth approximately $30,000.00 and concerned the

discovery of assets.  Defendant admits as much in his post-trial brief, stating that the "Ulysse

Nardin watches in dispute would likely be considered material, as the valuable timepieces

concern the assets of the bankruptcy estate."[117]  If the Court had found that the watches were

property of Defendant's bankruptcy estate, then any alleged false oaths would be material.

---

[117] Def.'s Post-Trial Br. at 23.

For the reasons stated above, and in strictly and narrowly construing 11 U.S.C. §
727(a)(4)(A) and (d)(1) in favor of Defendant, the Court determines that Plaintiff has failed to
carry his burden.  Plaintiff has failed to establish that Defendant owned the two watches at issue.
As a result, Plaintiff has failed to show by a preponderance of the evidence that the statements
were false, that Defendant knew the statements were false, and that the statements were made
with fraudulent intent.

## CONCLUSION

Revocation of discharge is a harsh and severe result.  Bearing in mind the extreme nature
of this result, the Court must strictly and narrowly construe the provisions of Section 727 in
favor of Defendant.  Based on these considerations and the evidence before it, the Court finds
that Plaintiff has failed to establish, by a preponderance of the evidence, his claim under 11
U.S.C. § 727(d)(1).

## CONCLUSIONS OF LAW

1.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(J) &
(O) and this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) & 1334.

2.      Venue is proper before this Court under 28 U.S.C. §§ 1408 & 1409.

3.      Defendant's discharge is not revoked.

**ORDER**

IT IS ORDERED:  The Defendant's discharge is not revoked.

LET JUDGMENT BE ENTERED ACCORDINGLY.

/e/ Kathleen H. Sanberg

_____
KATHLEEN H. SANBERG
CHIEF UNITED STATES BANKRUPTCY JUDGE